MARY TOLSON ᴇᴛ ᴀʟ. vs. DANIEL TOLSON ᴇᴛ ᴀʟ.

1. On a bill for the specific performance of a contract for the sale of land, it is competent for the defendant to prove a parole discharge or waiver of performance.

2. Where A, the father, had purchased a tract of land of B the son, had paid the purchase money, and taken possession of and improved the land; on a bill filed by a portion of the heirs of A, to compel the heirs of B to make a title, evidence that B had repeatedly declared to his father that he was ready to make a deed; that the father lived 22 years after the purchase, during all which time up to B's death, 14 years after the sale, he refused to accept a deed—after B's death, instituted no proceedings to get a title—but on all occasions declared that he intended that B or B's children should have the land—that B was the youngest and favorite son, and that he died at an early age, leaving a large family—that the father was possessed of a good property,—is sufficient to shew a discharge of the performance of the contract.

## APPEAL from Howard Circuit Court.

LEONARD, *for Appellants, insists :*

1. Mrs. Howard and John Tolson, who after the death of their father William Tolson, conveyed their interest in the land, to the complainants are necessary parties to the bill, and for want of these parties the decree must be reversed. Mitford's Chan. Plead., 68, 220; Hickock vs. Scribner, 3 Johnson cases, 317; Fresh vs. Million, 9 Mo. Rep., 320, 321.

2. The decree is erroneous in declaring that the land at the time of William Tolson's death, belonged in common to the complainants and the children of Thomas Tolson, when according to the facts stated in the bill, Mrs. Howard and John Tolson were also tenants in common with them in the ownership. The decree is still further erroneous in directing the children of Thomas Tolson to convey to the complainants all the title to the land, that was in their father at his death, thus divesting them of their admitted shares in the land, as heirs and devisees of their grandfather William Tolson.

3. A parol waiver or abandonment even of a written contract for the purchase of land, is a bar to a specific performance. Here the conduct and declarations of William Tolson—the relation in which he stood to Thomas Tolson, and the situation of his son's family, all demonstrate that he intended the land after his own death, for his son and family, as a provision for them, and long before his death, had abandoned all claim to the specific execution that is now sought for by a portion of his heirs at law. Gowman vs. Salsbury, 1 Vern., 240; Stevens vs. Cooper, 1 John. C. Rep., 430; Botsford vs. Burr, 2 John. C. Rep., 416; Wentz vs. Dehaven, ex'r. of Dehaven, 1 Searg. & Rawl., 316; 2 Story's Equity, 1st Ed. chap. 18, sec. 770.

CLARK, *for Appellee, insists :*

1. The important question in this case is, whether under all the facts presented in the record, a specific execution of this contract can be enforced against the plea of the statute of frauds which is insisted on by the defendants. It is a rule of equity established by the English and most of the American authorities, that parol agreements for land as well as other things, may be enforced if

*Mary Tolson, et al. vs. Daniel Tolson, et al.*

the agreement has been in part performed, provided such agreement is admitted or satisfactorily proven. The evidence in this case clearly proves the agreement as charged in the bill, the payment of the purchase money, taking possession of the land, and making improvements thereon under the purchase and agreement; done too with the knowledge and by the consent of the grantor, are deemed sufficient acts to amount to such a part performance as will take the case out of the statute of frauds. This position is sustained very fully by the following authorities: 2 Story's Equity, 63 to 67; 1 John. Ch. Rep., 131; Phillips vs. Thompson, 14 John. Rep., 15; 4 Blackford Rep., 94; Johnson vs. Glaney and others, and the case of Moreland vs. Semasten, reported in the same book, p. 383. The case in 14 Johnson was an appeal from the Chancellor, and that court in that case reviews all the cases on this subject. So does the court in the cases cited in Blackford. The case of Halsa vs. Halsa decided by this Court, 7 Mo. Rep., 28, is cited as bearing upon this subject.

2. The objection to the reception of parol evidence to establish a parol agreement, and to prove performance under the agreement, cannot be well founded. The person in possession would be a trespasser if no contract existed, and might be proceeded against as a trespasser; to relieve him from which he is always allowed to prove the contract under which he occupies, and being allowed to give such evidence for one purpose, he is allowed to give it for all purposes. 1 Philips' Evid., 575.

3. It is contended, that the evidence on the record tending to show an abandonment of the contract on the part of the ancestor of the complainants, was addressed to the Chancellor with the other evidence, and was to be weighed by him. It had but little weight with him, doubtless coming from the source it did, and obtained as it was—the chancellor having passed it, this Court will not reverse on that account unless he was clearly and palpably wrong.

4. The decree we think is fully justified by the evidence, and is in legal form.


NAPTON, J., *delivered the opinion of the Court.*

This was a suit in Chancery by the heirs of William Tolson, to procure the legal title to a tract of land in Howard county, and to restrain further proceedings upon an action of ejectment instituted upon such legal title by the heirs of Thomas Tolson, deceased. The facts as stated in the bill, were as follows:

In the year 1819, Samuel Alexander, entered at the land office in Franklin, under the credit system, a quarter section of land, and paid one fourth of the purchase money to the United States. In 1821, Thos· Tolson purchased the said quarter section from Alexander, and afterwards relinquished the east half of said quarter. In 1822, William Tolson, the father of said Thomas, removed from Kentucky to this State, and was about locating in Boone county, but his son Thomas, as an inducement for him to settle in Howard, proposed to let him have this half quarter section of land, at the price he had given, with the interest.— The purchase was made, and William Tolson took possession of the land, in the fall of 1822, and paid up to the United States what was still due on the land, and to Thomas Tolson what had already been advanced to Alexander by said Thomas. William Tolson improved this land and re-

sided on it until his death in 1844. Thomas Tolson lived with his father until he married, and then settled another farm in the vicinity, where he continued until his death, which took place in 1836. Thomas Tolson left seven children. He never pretended to any title to the land, at any time after the sale to his father, but on the contrary repeatedly offered to make him a deed, which the old man upon some pretext or other, evaded or postponed. The patent for this land had issued in 1825, to Thomas Tolson, assignee of Alexander. In 1829, Wm. Tolson being about to marry a second wife, made his will, leaving all his property, both personal and real to be equally divided among his children. In 1844 he died, and the plaintiffs in this suit are his heirs at law, excepting the children of Thomas Tolson, deceased, who were defendants, and his daughter Mrs. Howard, and his son John Tolson, the two last having sold their interest to the remaining children of William Tolson.

The defendants who were minors answered by their guardians, denying the contract as alleged in the bill, and insisting on the statute of frauds; they moreover relied on an abandonment of all right to a specific execution of the contract on the part of William Tolson, and insisted, that the title had been suffered to remain in Thomas Tolson by his father, with the intent that the land should be a provision for his children.

At the hearing, the evidence on the part of the plaintiffs, established all the material allegations of their bill, beyond all controversy. The defendants however introduced evidence for the purpose of showing, that there was a parol waiver by William Tolson of his right to a legal title and that the legal title was purposely left in Thomas Tolson, with a view to benefit his children. As the case must turn upon this point, we will state the material parts of this testimony. Previous to this it may be as well to state, that the proof introduced by the complainants showed most clearly, that Thomas Tolson (the son) always acknowledged his father's title to this land, and repeatedly proffered to make him a deed.

*N. Todd*, one of the witnesses for complainants, stated that in conversations which he had with the old man in the years 1825, 1826 and 1827, he heard him say, "that the right to the land was not made, that his children would not pay for making a deed; that *Thomas was a good boy*, and all he cared about was his life time in the land."

*Thorp*, a witness for defendants, was present at the death of Thomas Tolson in 1836. A conversation arose in the room of the dying man, about this deed. Thomas expressed his willingness to make one then, but the old man said, "if one was made, the children would pay not the expense—the land was for them any how, he had often told them so, and

they would not pay a cent, and he did not care a d——n; that he would as soon Polly and the children should have it."

*Mrs. Thorp* was present on the same occasion, and heard Thomas express his willingness to make a deed. The old man said, "you have always been ready, but my children would not pay one cent—it was for them, and I don't care a d——n." Thomas, the son, then asked him to recollect Polly and the children; to which the old man replied, "it (meaning the land) he intended for Polly and the children." The old man afterwards walked into the kitchen, where the witness and others were sitting, and said there, it was for Polly and her children, he always intended it—his children would not pay a cent, and he did not care a damn."

*Mrs. Moberly*, another witness was present on the same occasion.— She met Wm. Tolson in the kitchen; and when some of his children went out, he said, "he did not want the right at all—that Tom and Polly always knew him whenever they met him, and that he always intended to do something for Polly and her children."

*John Moberly* was present on the same occasion, and saw the old man come out of the kitchen smoking a pipe, when he said to witness, "that James Brown had sent for him; that some of the children kept fussing about the right to the land—that he did not want it—he could have had it long ago, but Thomas had been a dutiful boy, and he did not want it."

*Braxton Brown* testified that he heard a conversation between Thomas Tolson and his father, some months before the death of the former.— Thomas said he was ready to make the deed, to which the old man replied, "that he did not want it—that he had tried to get the boys to pay for it, and they would not, and by G——d he would not—that if they did not want it, he did not."

*John Snell* had a few words with the old man at the funeral of Thomas Tolson, he said to the witness that, "two of his sons did not know him to-day, and the reason was, that he had not taken a deed from Thomas.— That he cared nothing about it—they would not pay the expense, and he would as soon Tom's children had it as an body else."

*R. Brown* was also present when Thomas Tolson was on his death bed. The old man was called in, and Thomas said he was ready to sign the deed, if it was ready. The old man left the room, and on going out touched witness and asked him what he should do. Witness suggested that Gen. Clark lived near and would write the deed. The old man was about starting to Gen. Clark's, but stopped, and observed, "if he did it, they wouldn't pay for it, and it might go to hell—that Thomas had always been a dutiful child to him, and so had Polly—that they would not

get more than their part any how, and it might go."

In the spring following, this witness had another conversation with the old man, when he reminded witness of his promise to Thomas, "that the land was in Thomas' name, but if the witness did not watch, they would cheat him out of it." The old man was drinking when this conversation took place. William Tolson had twenty or thirty slaves, and a quarter section of land besides the one now in controversy, and horses and stock of various kinds, and money at interest to the amount of one thousand dollars, and was out of debt.

The Circuit Court decreed for the complainants, vesting the title to the land in the heirs of William Tolson, and perpetually enjoining the ejectment suit.

Upon the first branch of this case, there seems to be no ground for controversy either as to the law or the facts. The testimony establishes beyond dispute, that William Tolson the father, purchased the tract of land in dispute, from his son Thomas, and paid for it, and took possession of it, and retained the possession until his death—the legal title being suffered to remain in the son. Were these the only facts in the case, it is clear that there would be no obstacle to an enforcement of this contract, notwithstanding the statute of frauds. But the heirs of the son rely on a parol waiver of this contract, and the only controvertible point in the case, is, whether such a parol waiver be admissible, to rebut the equity made out; and if admissible, whether the evidence sufficiently establishes it.

It has been held that a specific execution of even a written agreement may be resisted on the ground of a parol waiver, or a waiver by acts of the parties. Price vs. Dyer, 17 Ves., 356; 6 Ves., 336, in note; 4 Ves., 848; Woolan vs. Hearne, 7 Ves., 211; Davis vs. Symonds, 1 Cox, 407. In what manner a written agreement may be affected by parol testimony, and upon what grounds the courts will proceed in admitting or rejecting such evidence, are the points which have been chiefly discussed in the cases cited. No questions of this character arise here, but the principle of those decisions is so far important as to place beyond dispute the right of the defendant to resist the specific execution of a contract, which has never been reduced to writing, by testimony of equal dignity with that relied on to enforce it.

The circumstances of the present case are singular. Both the parties to the original transaction are dead, and the relation between them, was that of father and son. The title to the land was permitted to remain in the son for 22 years—during fourteen of which the son was living, and

at all times expressed an entire willingness to make the conveyance.— There is no evidence in the case to show, that this failure to convey, arose from ignorance on the part of the father of his rights, or from any disinclination on the part of the son to acknowledge them. It does not appear to have been the result of accident, or inattention, much less of any trick or contrivance on the part of the son. The old man, it seems, was frequently reminded of the condition of affairs, and of the propriety of getting a deed. His invariable excuse according the statement of the witnesses was, "that the children would not pay the expense, and he did not care a damn." What inference is to be drawn from such language as this, often repeated, and from his whole conduct in relation to the matter ? Can it really be credited, that a man in his circumstancas, the owner of a well stocked farm, of twenty or thirty slaves, and with money at interest, and out of debt, was unwilling to encounter the expense of a dollar or two in procuring a deed, if he really desired or intended that the deed should be made? Is it not more rational to set this down as a pretext, and to consider it, in connexion with his whole conduct, as indicative of a fixed design to leave the legal title where it was? It is true that the language of William Tolson was somewhat variant and contradictory, sometimes declaring as he did, that the land in dispute was "for Polly and her children," and at other times stating, "that the land belonged to his children *any how*, but that they would not pay the expense of the deed." These contradictory statements may however be accounted for, by supposing that there was an unwillingness on the part of the old man to aver a settled determination, that this land should go to his son Thomas, to the exclusion of his other children. His expressions therefore, are not always consistent, but it is to be observed, that however inconsistent may have been his declarations before different witnesses, his conduct was always the same. The length of time during which this conduct continued, is a circumstance entitled as we think, to great weight, in arriving at his real intentions. This refusal on his part to take any trouble or expense in procuring a deed, was not a circumstance which occurred only once or twice in a short period, but this condition of things was allowed to continue for 22 years, during all which time the deed could have been obtained at any moment, by application to his son, during his life time, or by taking the proper steps after his death. This is a most unaccountable degree of inattention on the part of a man not shown to be imbecile or in any way incompetent to manage his business. We cannot resist the conclusion if the statements of these seven or eight witnesses are to be relied on, that William Tolson did not desire a convey-

ance of this land to himself, and that he designed it for the benefit of his son Thomas' children. It appears that Thomas was his youngest and favorite son—that h e humored the eccentricities of his father, and that he died at an early age, leaving a wife and seven children. It is inferible from the testimony, that his other children were all previous to his death, married and comfortably settled and provided for. Under these circumstances there is nothing very singular in the father's evincing a disposition to make some additional provision for a family of orphans—the offspring of his youngest and favorite child.

The other Judges concurring, the decree is reversed and the bill dismissed.